PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JLKX CORPORATION, *et al.*, | ) | |
| | ) | CASE NO. 4:15CV1993 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| BOBCAT ENERGY | ) | |
| RESOURCES, LLC, *et al.*, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving ECF No. 71] |

Pending is Defendants Bobcat Energy Resources, LLC, Resource Land Holdings, LLC, and Bobcat Well & Pipeline LLC's (collectively, "Bobcat") Motion for Summary Judgment (ECF No. 71). The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. The Court has also considered the oral arguments of counsel offered during the Final Pretrial Conference held on December 10, 2018. For the reasons set forth below, the motion is denied.[1]

---

[1] The Court announced its inclination to deny the within motion during the Final Pretrial Conference.

(4:15CV1993)

## I. Stipulated Facts and Background

The stipulated facts[2] are as follows:

**A.      Resource Land Holdings' Involvement With the D&L Energy Bankruptcy Proceedings and the Joint Ventures Before November 30, 2014**

1.   Resource Land Holdings, LLC ("RLH") participated in the Chapter 11 bankruptcy proceedings of D&L Energy, Inc. and its affiliate, Petroflow, Inc.  The parties refer to the two companies collectively as "D&L Energy"[3] because the bankruptcy court ordered the two entities' Chapter 11 proceedings substantively consolidated.  The proceedings were filed in the United States Bankruptcy Court for the Northern District of Ohio, being Case No. 13-40813.

2.   In response to a D&L Energy solicitation, RLH tendered a "stalking horse" bid for the purchase of certain of D&L Energy's assets.

3.   That bid took the form of an Asset Purchase Agreement ("Agreement" or "APA") by and between and among RLH or Bobcat Energy Resources, LLC, an affiliate of RLH (which the APA defined collectively as "Buyer"), D&L Energy and Petroflow, Inc.  ECF No. 69-1 at PageID #: 1654-89 is a true and correct copy of the Agreement.

4.   The assets that were the subject of that bid and the APA included the rights to operate and manage certain joint ventures D&L Energy had created and managed.  *See* APA § 1.1 (ECF No. 69-1 at PageID #: 1655) ("all of the Seller's rights and interests arising under or in

---

[2]  *See* Stipulated Material Undisputed Facts (ECF No. 69).

[3]  Order Approving Motion of Anthony J. DeGirolamo, Chapter 7 Trustee, for Order Substantively Consolidating Debtors' Estates (Doc 1462) entered on May 28, 2015 in the D&L Energy bankruptcy case.

(4:15CV1993)

connection with (I) any contracts listed on Schedule 1.1(b) that are capable of being transferred

to Buyer at the date of Closing").

     5.  On October 30, 2014, the bankruptcy court entered an Order (I) Authorizing the Public

Sale of the Acquired Public Sale Assets, Free and Clear of Liens, Claims, Encumbrances and

Interests; and (II) Granting Related Relief (Doc 1044) in the D&L Energy bankruptcy case (the

"Public Sale Order"). ECF No. 69-1 is a true and correct copy of the Public Sale Order, to which

the bankruptcy court also attached the court-approved APA.

     6.  In the Public Sale Order, the bankruptcy court authorized D&L Energy's sale of the

Acquired Public Sale Assets as follows:

> . . . Debtors are hereby authorized to sell all of their rights, title and interests in
> and to the Acquired Public Sale Assets to the Buyer in accordance with the terms
> and subject to the conditions of the Stalking Horse APA, and pending and/or
> future motions to assume and/or assign executor contracts and/or unexpired leases
> as per further order of this Court.  Buyer is hereby authorized to take title to the
> Acquired Public Sale Assets as approved herein either directly or by one or more
> affiliates or designees of Buyer.  The use of the term "Buyer" herein shall mean
> Buyer and/or any such designees or affiliates. . . .

ECF No. 69-1 at PageID #: 1641, ¶ 7.

     7.  The Public Sale Order defines the Acquired Public Sale Assets to which it applies

as those the parties identified in the APA, which included:

> **1.  Operations and Management of Wells, Pipelines, Joint Ventures, and
> underlying Held By Production Leases.**  This category includes the Debtors'
> rights, title, interest and responsibilities, as such may be, in each individual asset,
> including:
>> **1(a) - Operation (to the extent transferrable) of approximately
>> 550 conventional Clinton formation wells** in the following
>> counties, each as detailed in the Universe of Wells 8.1 document
> dated August 12, 2014 and individual well files listed on the

3

attached Digital Video Disc ("DVD") marked as Exhibit 1 to Schedule 1.1(a) and incorporated, by reference, herein:

\* \* \*

> **1(c) - Operation of Joint Ventures** pursuant to the operating agreement of each joint venture, and to the extent that such operations may be transferred each and all as detailed in Exhibit 1 to Schedule 1.1(a) and incorporated herein by reference[.]

ECF No. 69-1 at PageID #: 1677-78.

8. More specifically, Paragraph 9 of the Public Sale Order provides, in pertinent part, that Bobcat acquired the Acquired Public Sale Assets

> free and clear of liens, claims, encumbrances, or interests of any kind or nature, including, but not limited to: (I) those interests that purport to give any party a right or option to effect a setoff against or any post-petition forfeiture, modification or termination of the Sellers' interests in the Acquired Public Sale Assets, or any similar rights if any; (ii) those interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances or charges of any kind or nature, if any; and (iii) those interests arising in connection with any agreements, transactions, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors, affiliates, or representatives . . . .

ECF No. 69-1 at PageID #: 1642.

9. And, the Public Sale Order also directed:

> Except as otherwise specifically set forth in the Stalking Horse APA, the Buyer shall not assume or be obligated to pay, perform, and/or otherwise discharge, any liens, claims, encumbrances and interests of the Debtors arising pursuant to the Debtors' ownership, use or operation of their assets or facilities prior to the date of the Closing.

ECF No. 69-1 at PageID #: 1644-45, ¶ 13.

10. Paragraph 12 of the Public Sale Order provides:

> <u>Effect of this Sale Order and Consummation of Sale.</u> Debtors and Debtors' attorney(s)[] are authorized to: (a) carry out all of the provisions of the Stalking Horse APA and this Sale Order; (b) issue, execute, deliver, file and

record, as appropriate, the documents evidencing and consummating the Stalking Horse APA and other related agreements; (c) take any and all actions contemplated by the Stalking Horse APA or this Sale Order; and (d) perform such other acts and execute and deliver such other documents as are consistent with and necessary or appropriate to implement, effectuate and consummate the intent of the parties entering into the Stalking Horse APA and other related agreements to sell, assign and transfer from the Debtors to the Buyer the Acquired Public Sale Assets[.]

ECF No. 69-1 at PageID #: 1644.

11. Paragraph 26 of the Public Sale Order provides:

Modification. The Stalking Horse APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or their creditors.

ECF No. 69-1 at PageID #: 1652.

12. D&L Energy and RLH scheduled the closing of the Public Sale to be November 30, 2014. ECF No. 69-2 is a true and correct copy of the two entities' November 14, 2014 Joint Status Report (Doc 1083), setting that Closing Date.

13. In Paragraph 27 of the Public Sale Order, the bankruptcy court directed, in pertinent part:

Retention of Jurisdiction. This Court shall retain exclusive jurisdiction to: (a) interpret and enforce the provisions of the Stalking Horse APA (including any and all amendments thereto) and this Sale Order in all respects; . . . (c) hear, determine and resolve any and all disputes arising from the construction or implementation of the Stalking Horse APA or this Sale Order; (d) protect Buyer against and from any liens, claims, or encumbrances, or interests asserted against or in the Acquired Public Sale Assets, whether or not such liens, claims, encumbrances or interests attach to the Sale Proceeds; and (e) determine any

disputes raised by non-debtor/counterparties concerning the assumption and assignment of the Contracts to Buyer.

ECF No. 69-1 at PageID #: 1652.

**B.     Management and Operation of the Joint Ventures Following the Closing Date**

14.  In its capacity as Buyer and RLH's assignee, Bobcat took title to the various well and pipeline assets that were the subject of the bankruptcy court's Public Sale Order.

15.  Bobcat assigned its rights to operate and manage the joint ventures, and to operate the various wells in which the joint ventures hold working interests and certain pipelines to Bobcat Well and Pipeline, LLC ("BW&P").

**C.     The JV Investors and Joint Venture Agreements**

16.  Plaintiffs/Counterclaim Defendants (or "JV Investors") are non-operator joint venturers of the joint ventures for which BW&P has been and is today the operator.

17.  The JV Investors invested, through a number of joint ventures, to own working interests in oil and gas wells that were sponsored and operated by D&L Energy, and the JV Investors were responsible for their proportionate share of certain costs associated with the wells and are entitled to, and share in, the profits of the wells in proportion to their stated working interests.

18.  An operator works for the working interest owners of wells and is generally responsible for conducting the exploration, development, production, and closure of an oil and gas well, and to collect all revenues from and pay all expenses incurred in the wells.

19.  The JV Investors/working interest owners were entitled to certain proceeds after

(4:15CV1993)

deduction of landowner royalties, overriding royalties, and certain operating expenses.

20.  The JV Investors are the beneficiaries of the Production Trust Account involving revenues generated from approximately 525 wells into which account the operator deposits revenues and from which the operator pays expenses.

21.  It is BW&P's responsibility to maintain and operate the wells in an economically prudent manner.

22.  Since December 1, 2014, there has been a drop in oil and gas prices.

23.  Since December 1, 2014, BW&P has shut-in a majority of the joint venture wells.

24.  In Plaintiffs' August 23, 2017 Motion for Class Certification (ECF No. 53), they advised the Court:

> . . . The non-operator joint venturers entered into a contractual relationship with D&L Energy, Inc. for the creation of the DL-JVs through:  (1) Certificate and Agreement of Joint Venture; (2) Operating Agreement; (3) Subscription Agreement; (4) Drilling Contract; and (5) an incorporated Explanatory Statement (collectively, "DL-JV Agreements").  *Id.* at ¶ 5.  *D&L structured all of the DL-JV Agreements based on standard form templates*, with D&L to serve as the Manager/Operator of the oil and gas wells.  *Id.* at ¶¶ 5, 7. . . .

ECF No. 53 at PageID #: 1432 (citing to Affidavit of Nicholas Paparodis (Doc 1197-2) (emphasis added).

25.  Plaintiffs' Motion for Class Certification was granted without opposition on October 25, 2017.  *See* Order (ECF No. 56).

26.  On March 21, 2018, Plaintiffs produced a group of representative statements D&L Energy had historically provided to several of the Class Members, which documents they marked as JLKX00172-479.  ECF No. 69-4 is a true and correct copy of "The James L. Knox Rev. Trust"

7

dated February 27, 2008 at JLKX00172-207 (showing D&L Energy charging well maintenance expenses, meter reading expenses).

**D.      Plaintiffs Have Incurred No Damages From Charges for Attorneys' and Accountants' Fees and Costs; Charges That BW&P Has Since Reversed**

27.  Each of the Class Representatives received a report on 2016 activity of his, her or its respective joint venture working interest investments, which report BW&P delivered under a cover letter dated in April 2017.  ECF No. 69-3 is an illustrative example of that April 2017 form letter.

28.  In April 2017, BW&P sent a letter to certain working interest owners stating that it was reversing and no longer charging the working interest owners for certain plugging reserves, maintenance costs, attorney's fees, and forensic accounting fees.

29.  Effective December 31, 2016, BW&P reversed the charges it previously assessed the Class Representatives for plugging liabilities and notified them of that fact in April 2017.

30.  BW&P has not assessed the Class Representatives for plugging liabilities at any time from January 1, 2017 to the present.

31.  Effective December 31, 2016, BW&P reversed the charges it previously assessed the Class Representatives as working interest owners for attorneys' fees and costs incurred in the D&L Energy Chapter 11 bankruptcy proceedings while pursuing administrative expense claims and an unsecured proof of claim.

32.  BW&P has not assessed the Class Representatives for attorneys' fees and costs incurred in the D&L Energy Chapter 11 bankruptcy proceedings at any time from January 1, 2017 to the present.

33.  Effective December 31, 2016, BW&P reversed the charges it previously assessed the Class Representatives as working interest owners for accountants' fees and costs incurred in the D&L Energy Chapter 11 bankruptcy proceedings while pursuing administrative expense claims and an unsecured proof of claim.

34.  BW&P has not assessed the Class Representatives for accountants' fees and costs incurred in the D&L Energy Chapter 11 bankruptcy proceedings at any time from January 1, 2017 to the present.

**E.      Unpaid Joint Interest Billings ("JIBs")**

35.  The Class Representatives have not paid the joint interest billing statements Bobcat issued from December 1, 2014 to the present because they do not believe that those amounts are owed.

36.  The JV Investors did not make payments to BW&P in response to invoices it issued to them because the amounts allegedly owed are in dispute for the reasons discussed in the First Amended Complaint With Class Action Allegations (ECF No. 9).

37.  BW&P seeks to recoup from Plaintiffs the deficiency amounts in various JIB accounts, and previously sought to include plugging reserve deficiencies in the amounts owed.

This class action was filed on September 25, 2015.  On October 16, 2015, Plaintiffs filed a First Amended Complaint With Class Action Allegations (ECF No. 9).  Count One is for breach of contract.  Count Two alleges breach of fiduciary duty.  Count Three is for gross negligence and misconduct.  Count Four requests a constructive trust.  Count Five is for declaratory judgment.  Count Six requests an accounting.

(4:15CV1993)

On March 9, 2018, Bobcat filed an Amended Answer and Counterclaim (ECF No. 63). The Counterclaim is for damages against Plaintiffs for their refusal to pay the amounts Bobcat has invoiced them under the same contracts for the same amounts that are the subject of Plaintiffs' declaratory judgment claim.

## II. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980

F.2d at 403.  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact.  *Id.* at 248.  The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment.  *Id.*

### III.  Analysis

#### A.    Defendant Resource Land Holdings, LLC

Bobcat argues that the Court should grant summary judgment in favor of Resource Land Holdings, LLC ("RLH") because it was never the manager of the Plaintiffs' joint ventures nor

was it the operator of any of the wells that Plaintiffs' own. However, even when parties lack

contractual privity, a plaintiff may recover if a "sufficient nexus" exists between the parties.

*Clevecon, Inc. v. Northeast Ohio Regional Sewer District*, 90 Ohio App.3d 215, 221 (1993); *see*

*also Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412 (2005) (("[P]rivity

or a sufficient nexus that could serve as a substitute for privity may impose only those contractual

duties and liability for breach of those duties agreed to by the parties to the contract. . . .").

The Court finds there is a sufficient nexus between RLH and Bobcat Energy Resources,

LLC and Bobcat Well & Pipeline LLC's because RLH is the owner and financier of the Bobcat

entities. As Bobcat's President testified:

> Q.    Resource Land Holdings; what is that?
> A.    That's an investment fund.
> Q.    How, if you know, is Resource Land Holdings affiliated with Bobcat
>          Energy Resources?
> A.    One of their funds is an owner of Bobcat Energy Resources.

Deposition of Robert Rivkin (ECF No. 72-14) at PageID #: 2360. Moreover, RLH financed the

purchase of D&L Energy's assets, was a party to the DL-JV Agreements, and then assigned its

rights to operate the DL-JV Wells to Bobcat. *See* ECF No. 69 at PageID #: 1621, ¶¶ 3-5; PageID

#: 1625, ¶ 14. Finally, RLH assigned and transferred its Operator interests in the DL-JV Wells to

Bobcat without giving proper notice to the Class Members as required by Paragraph 12 of the

Operating Agreements. Affidavits of Edward Hazboun (ECF No. 72-1) and James L. Knox

(ECF No. 72-2). According to Plaintiffs, RLH is the genesis of this dispute because its

unauthorized actions resulted in an assignment of D&L Energy's assets to RLH-controlled

(4:15CV1993)

entities (Bobcat Energy Resources, LLC and Bobcat Well & Pipeline), causing the resultant

mismanagement of the DL-JV Wells and violations of the various DL-JV Agreements.

    **B.**    **Breach of Contract Claims (Count One)**

**1.**

Defendants move the Court for summary judgment on Plaintiffs' breach of contract

claims while admitting that they have failed to pay distributions owed to the Class Members

under the DL-JV Agreements.  Bobcat's Controller, Andrew Dennison, testified:

> Q.    So, you're not paying people who have a balance due because someone over here may have a negative balance?
> A.    Right.
>
>         \*   \*   \*
>
> Q.    I just want to make sure I understand the concept that you are explaining to me.  If I'm an investor and I have a positive balance, when you send me one of these annual reports this says that the wells that I'm in I'm $1,000 to the good; you're not going to mail me that money because someone else, such as Ms. Wallace, might owe $500 negative because of a jib.  Is that right?
> A.    I'm not going to put numbers to it.
> Q.    But is that the concept without the values?
> A.    Yeah.
> Q.    What's the logic for suspending a payment to me or to someone who has a positive balance because someone else hasn't paid you money?
> A.    Because we don't have money.  There is no cash.

Deposition of Andrew Dennison (ECF No. 72-8) at PageID #: 2307-2308.  Bobcat's own

financial records for the Production Trust Account, however, show a positive net balance of

$598,855.54, as of December 31, 2017.  Bobcat Operating Statement for all Wells, 12/01/2014 --

12/31/2017 (ECF No. 72-9).

## 2.

Defendants have assessed additional plugging expenses against the DL-JV Wells and withheld distributions Plaintiffs claim are owed to the Class Members. Plaintiffs argue that the Class Members have already paid their portion of the plugging expenses under the DL-JV Agreements. Plaintiffs cite four (4) provisions in support of their argument that Defendants are attempting to assess duplicative plugging expenses against the DL-JV Wells for which the Class Members have already paid as part of a "total" or "fixed" purchase price. Plaintiffs cite the Explanatory Statements prefacing the DL-JV Agreements ("The proceeds of the offering will be used by the Joint Venture to pay its share of the turnkey price of drilling and developing (*or plugging and abandoning*) the prospective well." (*e.g.*, Agreement for DL-JV 2002-1 (ECF No. 71-2) at PageID #: 1751 (emphasis added)). The Drilling Contracts further state: "In the event that a Well drilled hereunder shall be determined to be a dry hole, then Contractor shall plug and abandon the Well and return to Owner cash in the amount of one-third of the amount pre-paid. . . ." (*e.g.*, ECF No. 71-2 at PageID #: 1821, ¶ 2.2).

Next, Plaintiffs cite an Agreement of Joint Venture for DLJV 2009-2 that provides, in pertinent part:

> . . . The *total* cost of each Well to the Joint Venture for its 100% working interest is $350,000. Of the $350,000, $280,000 is to be paid pursuant to the intangible drilling and development costs charged under the Turnkey Contract and the estimated $70,000 per Well tangible costs will be invoiced to the Joint Venture as required.

ECF No. 71-12 at PageID #: 1967 (emphasis added). The Drilling Contract for DLJV 2009-2

defines the "intangible costs" as follows:

> 2.3　For purposes of this Contract, "intangible drilling costs" shall mean those expenditures associated with property acquisition and the drilling and completion of oil and gas wells that under present law are deductible currently for federal income tax purposes.  This includes:
>
> *   *   *
>
> (ii)　the expense of plugging and abandoning any well before a completion attempt; and
>
> (iii)　the costs (other than tangible costs and lease costs) to re-enter and deepen an existing well, complete the well to deeper formations or reservoirs, or plug and abandon the well if it is nonproductive from the targeted deeper formations or reservoirs.

ECF No. 71-12 at PageID #: 1984.  According to Plaintiffs, the total purchase price paid by the Class Members covered plugging before a completion attempt in the event of a dry hole or in the event that an existing well needs to be plugged.

In addition, the DL-JV Agreements identify ongoing operating expenses that the Class Members must pay and those provisions do not include plugging liabilities.

> It is understood that operating expenses of the Joint Venture shall include, but may not be limited to, administrative items and costs such as insurance costs, permits, lease acquisition, survey, title work, legal work, all other administrative costs and all costs attributable and pertinent to the organization and operation of the Joint Venture.

ECF No. 71-2 at PageID #: 1779, ¶ 8(c).  Plaintiffs argue that Defendants are seeking to allocate "exorbitant" plugging expenses against the Class Members when there is no provision in any of

(4:15CV1993)

the DL-JV Agreements allowing them to do so.[4]

**3.**

Defendants argue that Paragraphs 1-4 of the Agreements of Joint Venture authorized

Bobcat to incur attorneys' fees and forensic accounting fees on behalf of the DL-JV Wells.

Memorandum in Support (ECF No. 71-14) at PageID # 2055-58. Paragraph 1 of the Agreements

states:

> *With, and only with, the authority and approval as provided in Paragraph 4 of this Agreement*, Manager shall act as the "**Agent**" of the Joint Venture and shall be responsible for the overall supervision of the operation of the well(s), and for acting as such, Manager agrees that it shall act in consideration of the compensation as provided in Paragraph 8 herein.

ECF No. 71-2 at PageID #: 1775 (italics added). Similarly, Paragraph 2(a) of the Agreements

limits Defendants' authorization to act on behalf of the Joint Ventures:

> *With, and only with, the authority and approval as provided in Paragraph [4] of this Agreement*, Manager as Agent, shall be responsible for the hiring of the necessary parties and professional services in connection with this Agreement, the cost of such services to be paid directly by the Joint Venture. The Manager shall

---

[4] Plaintiffs also argue that their position on this issue is further supported by comparing the DL-JV Agreements to the Industry Partner Agreements. The Joint Venture Agreement between D&L Energy and Atlas Resources, Inc. provides that Atlas did not prepay for anything, but only paid when the plugging expenses were actually incurred. ECF No. 72-3 at PageID #: 2119-20, § VIII. The Operating Agreement between D&L Energy and Everflow Eastern Partners, L.P. provides that if either D&L Energy or Everflow Eastern should elect to buy out the other's working interest, the selling party shall receive the sales proceeds "net of plugging." ECF No. 72-4 at PageID #: 2130, ¶ 8. According to Plaintiffs, the Industry Partner Agreements specifically identify plugging costs as a future expense that is the responsibility of the Industry Partners, whereas the DL-JV Agreements include plugging costs as part of the "total" or "fixed" pre-paid purchase price and do not include plugging in any of the provisions addressing future operating expenses.

16

oversee the income and distribution of monies as hereinafter outlined.

ECF No. 71-2 at PageID #: 1776 (emphasis added). In addition, Paragraph 3 of the Agreements

provides:

> For purposes of carrying out the duties and responsibilities as provided in Paragraphs 1 and 2 above, *and with respect to the operation and supervision of the producing well(s) and of the leasehold estate(s)*, the Co-Venturers, as part owners of the working interests in the above-described lease(s), do hereby nominate, constitute, and appoint Manager as their agent, representative, and attorney-in-fact to act for and on their behalf, granting to Manager the right of operation and supervision *for the following acts that are ancillary to said operation, conditioned upon and with the approval and authority as provided in Paragraph 4 [herein below]:*
>        *   *   *

ECF No. 71-2 at PageID #: 1776 (emphasis added). Paragraph 4 of the Agreements requires

Defendants to consult with the Co-Venturers and, after consultation, allows Defendants to

perform the eight functions set forth therein if they deem those functions necessary and

appropriate:

> Manager, on behalf of itself and the Joint Venture, *after consultation with Co-Venturers*, 'Where it deems appropriate and necessary, shall:
>       (I) Comply with and carry out the duties and responsibilities applicable to it under the lease agreements and assignment subsequent thereto;
>       (ii) Hire either or both, a petroleum engineer and geologist . . .;
>       (iii) To receive and verify the accuracy of all payments made to the Joint Venture . . . and be responsible for the distribution of payments to Co-Venturers . . .;
>       (iv) . . . obtain or cause to be obtained all permits, approvals, authorizations from any governmental authority or agency, the lessor under any lease . . ;
>       (v) Make appropriate arrangements for the sale, of any oil and gas produced from the well(s);
>       (vi) Be responsible for the filing and reporting requirements of any governmental authority regulating the sale of oil and/or gas . . .;

> (vii) Review and enter into an operating agreement . . . appointing Manager as the ongoing operator . . .; and
> (viii) Review and pay for all expenses for the development and operation of the well(s).

ECF No. 71-2 at PageID #: 1777-78 (emphasis added).

Plaintiffs contend that Bobcat cannot pay these unwanted expenses from the profits generated by the DL-JV Wells. According to Plaintiffs, Paragraphs 1-4 of the DL-JV Agreements do not allow Defendants to unilaterally charge the Class Members for litigation-related attorneys' fees and forensic accounting fees incurred by Defendants to pursue claims against D&L Energy in the bankruptcy court, particularly when the Class Members never requested or wanted Defendants to pursue the administrative expense claims and unsecured proof of claim in the first place. Moreover, the bankruptcy court has squarely rejected these exact arguments of Defendants in its July 12, 2016 Order denying Bobcat's Application. *See* Memorandum Opinion (Doc 1650) entered in the D&L Energy bankruptcy case at Pages 64-68 of 84. ECF No. 72-5 is a copy of the Memorandum Opinion of the bankruptcy court.

Finally, Paragraph 8(c) of the Agreements of Joint Venture includes the only reference to "legal work," which is very limited:

> It is understood that operating expenses of the Joint Venture shall include, but may not be limited to, *administrative items and costs such as* insurance costs, permits, lease acquisition, survey, title work, *legal work*, all other administrative costs and all costs attributable and pertinent to the organization and operation of

the Joint Venture.

ECF No. 71-2 at PageID #: 1779 (emphasis added).  According to Plaintiffs, such legal costs can

only be fairly read to mean legal costs associated with the operations of the DL-JV Wells since

the costs for "legal work" is included within "administrative items and costs" attributable to the

"organization and operation of the Joint Venture."

**4.**

Since taking over the DL-JV Wells, Defendants have calculated whether or not a

distribution is owed to the Class Members using a two-step formula:

> Using the industry-standard Petroware software that Bobcat Energy
> Resources licenses (and that its predecessor-in-interest D&L Energy, used), all
> expenses and revenues are determined and allocated initially on a well-by-well
> basis and then on a working interest owner basis.  Distributions are made when
> the aggregate results of these allocations result in a net amount due to the working
> interest owner.
>     From the inception of Bobcat's purchase of certain assets from D&L
> Energy effective December 1, 2014, Bobcat has continued to use the Petroware
> software and to manage the production trust account in the same manner as D&L
> Energy operated and managed it for the preceding two decades.  The Petroware
> software tracks and accounts for, and has historically tracked and accounted for,
> revenues and expenses by well and working interest owner, and not by JV.  D&L
> Energy reported to the working interest owners that information, and Bobcat has
> continued reporting in that format.
>     The Petroware software determines each working interest owner's
> percentage of revenues due or expenses owed on a well-by-well basis.  The
> software then aggregates the revenues due and expenses owed for each working
> interest owner for all of the wells in which that person owns a working interest,
> and identifies whether the aggregate results in a net amount to be paid or a net
> amount owed.  Where there is a net amount due the working interest owner,
> Petroware calculates that amount and Bobcat issues a check from funds, if and to

the extent available, in the production trust account. Where there is a net amount owed, Petroware creates a JIB for the working interest owner.

Amended and Supplemented Response to Interrogatory No. 9 (ECF No. 72-10 at PageID #: 2317-18). Therefore, Defendants do not calculate distributions on a Joint Venture-by-Joint Venture basis. They argue that "[t]o provide historical financial information on a joint-venture-by-joint-venture basis would require expensive, time consuming manual work to restate all the financial information in that fashion for the last 20 years." Affidavit of Robert Rivkin (ECF No. 71-3) at PageID # 1858, ¶12. According to Defendants, "Bobcat has from December 1, 2014, as D&L Energy had previously done, calculated and reported to each investment working interest owner revenues received and expenses incurred on a well-by-well basis." ECF No. 71-3 at PageID # 1858, ¶11.

Plaintiffs argue the DL-JV Agreements do not permit Defendants to "wash" the gains from productive wells with the losses from other wells where those wells are in separate joint ventures. According to Plaintiffs, the DL-JV Agreements require that calculation of distributions be calculated on a Joint Venture-by-Joint Venture basis, but do not require the Class Members to pay additional monies to cover net losses on wells:

> **8)** (a) All Joint Venture revenues, gains and losses and distributions of cash by the Joint Venture shall be allocated or distributed, as the case may be, as follows:
>
> (I)      Before pay-out: 94% (79.3124% of gross proceeds from production) to Co-Venturers, and 6% (5.0624% of gross proceeds from production) to Manager; and
>
> (ii)     After pay-out: 88% (74.250[%] of gross proceeds from production) to Co-Venturers, and 12% (10.125[%] of gross proceeds from production) to Manager.

(b) It is understood that the Joint Venture shall own 100% of the working interests in the proposed well. It is further understood that the percentages of gross proceeds from production to be specified on Attachment "2" will be calculated as follows: gross proceeds (100%) less landowner royalty (12.5%) less overriding royalty (3.125 %) *times the percentage of Joint Venture profits allocable to each participant times 100% (since the Joint Venture only owns 100% of the working interests).*

* * *

ECF No. 71-2 at PageID #: 1779 (emphasis added). Attachment "2" to Agreement for DL-JV 2002-1 further explains how distributions shall be paid:

Gross well proceeds are subject to a 12% landowner royalty and a 3.125% overriding royalty. Accordingly, only 84.375% of gross proceeds from production will be available to the working interest holders. Since the Joint Venture owns 100% of the working interests, *84.375% of gross proceeds from production will be available to the Joint Venture.* The amount remaining after payment of expenses and establishment of reserves, if any, *shall be distributed in accordance with each participant's profit allocation.* The overriding royalty will be paid to D&L Energy, Inc., the Manager.

ECF No. 71-2 at PageID #: 1803, n. 2 (emphasis added).

Plaintiffs raise two additional points in support of their argument that the DL-JV Agreements do not permit Defendants to disregard the separate Joint Ventures and withhold distributions owed to a Joint Venture based on losses from another Joint Venture. First, D&L Energy did not offset gains and losses from different Joint Ventures to calculate distributions owed. Second, there is no right to offset based on the course of dealing doctrine.

**a.**

While D&L Energy calculated gains and losses on a well-by-well basis, it did not apply losses from one Joint Venture to offset gains from another Joint Venture as Defendants are doing. *See* Distribution Statement issued by D&L Energy to Class Representative The James L.

Knox Rev. Trust, dated February 27, 2008, for several DL-JV Wells. The Malson#1 well had a $418.43 gain for that month and the 1stChurch well had a loss. However, the 1stChurch's net loss is zeroed out for distribution purposes, so that the loss does not offset the gains from the Malson#1 and the other positive wells. ECF No. 72-2 at PageID #: 2114. Plaintiffs argue the reason that D&L Energy and the Class Members agreed to this approach is because D&L Energy (or the current Operator) has 100% authority under the DL-JV Agreements to determine which wells should be shut in if the wells become underproductive. Therefore, if gas and oil prices are down, the Operator should temporarily shut in the wells to reduce expenses and prevent future losses. The concern for the working interest owners is that an Operator may continue to operate unproductive wells at a growing loss in order to keep paying itself monthly operating and pumping fees. According to Plaintiffs, that is exactly what has happened in the case at bar. The distribution calculation method set forth in the DL-JV Agreements discourages the Operator from continuing to operate wells at a loss because the Operator will have to continue advancing expenses to cover growing losses.

### b.

Next, Plaintiffs contend the right of offset does not apply because the course of dealing between the Class Members and D&L Energy for 10+ years establishes that the Class Members do not owe debts for DL-JV Well losses. According to Plaintiffs, D&L Energy paid distributions on the positive wells and held the losses on the negative wells until future revenues covered those losses, and the Class Members continued to invest based on this course of dealing. However, as

the Bankruptcy Court's Public Sale Order directs, Bobcat purchased all of the subject D&L

Energy assets

> free and clear of liens, claims, encumbrances, or interests of any kind or nature, including, but not limited to: . . . (iii) those interests arising in connection with any agreements, transactions, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors, affiliates, or representatives. . . .

ECF No. 69-1 at PageID #: 1642, ¶ 9; *see also* ECF No. 69 at PageID #: 1622-23, ¶ 8.

**5.**

Finally, Plaintiffs argue that Defendants breached the DL-JV Agreements by assessing

improper charges for insurance, operating/pumping, and maintenance.

**a.**

Defendants allocate insurance premiums as expenses among the DL-JV Wells. Based on

Defendants' records, they also charge a 25% mark-up against them. Bobcat's controller testified:

> Q. And the amount charged by Bobcat, is it straight premium amount or is there a mark-up?
> A. There's a mark-up.
> Q. What's the mark-up?
> A. It's either 12-1/2 or 25. I would have to look back.

Deposition of Andrew Dennison (ECF No. 72-8) at PageID #: 2313. According to Plaintiffs, the

Class Members never agreed to such a mark-up, and the DL-JV Agreements do not provide for it.

In addition, Defendants took out an insurance policy with Chubb for the DL-JV Wells

that had a relatively high deductible (approximately $100,000) - far in excess of the amounts paid

for insuring the wells when D&L Energy was the operator. Under D&L Energy, the insurance

policy's deductible was "in the neighborhood of $10,000." Deposition of Nicholas Paparodis

(ECF No. 72-11) at PageID #: 2327. Robert Rivkin, the President and CEO of Bobcat Energy

Resources, LLC, attests that "Bobcat was only able to obtain a single quote from one carrier, Chubb. Bobcat therefore went with the one available coverage it had located." ECF No. 71-3 at PageID #: 1862, ¶ 26. However, according to the independent insurance agent whom serviced D&L Energy prior to the bankruptcy, he "had several communications with . . . [Mr.] Rivkin about providing insurance coverage." Affidavit of Josef C. Skemp (ECF No. 72-12) at PageID #: 2328, ¶ 6. "On November 26, 2014, [Mr. Skemp] sent an email to Resource Land Holdings, LLC for a general liability and umbrella policy with a $10,000 deductible." ECF No. 72-12 at PageID #: 2329, ¶ 9. Plaintiffs point out that the result of this was devastating for the Class Members invested in the Lillibridge Well, which incurred spill/clean-up expenses of $117,685.23 due to the higher deductible on the Chubb insurance policy. *See* Operating Statement for Lillibridge Well (ECF No. 72-13).

**b.**

The monthly operating and pumping fees are set out for the first year of operation under Paragraph 3 of the Operating Agreements. *See, e.g.*, Operating Agreement for DL-JV 2002-1 (ECF No. 71-2 at PageID #: 1805, ¶ 3). Paragraph 3 provides, in pertinent part: "Operator shall receive from the Joint Venture the amount of Two Hundred Dollars ($200.00) per month for each producing well as an operating fee and Two Hundred-Fifty Dollars ($250.00) per month for each producing well as a pumping fee." That paragraph also states that "[s]uch compensation rates may be re-negotiated annually." When Defendants took over the DL-JV Wells in 2014, they unilaterally increased the monthly operating and pumping fees that were in place between D&L Energy and the Class Members, without re-negotiating or obtaining the consent of those Class

Members. For example, Class Representative Janet Hazboun Investments, LLC was being charged $200 in monthly fees in October 2014 and November 2014. *See* Detailed Suspended Revenue and JB Expenses Account Detail (ECF No. 72-1 at PageID #: 2109-10). However, once Defendants took over on December 1, 2014, they unilaterally increased their fees to $400 per month for "Admin/Oper & Pump Fees." Even though at $400/month Bobcat is charging less than the contractually-allowed price, there still was no consultation or re-negotiation with the members of Janet Hazboun Investments, LLC. *See* ECF No. 72-1 at PageID #: 2106, ¶ 14.

**c.**

The DL-JV Operating Agreements state that monthly operating and pumping fees are to compensate the Operator "for the administration, *maintenance* and supervision of the production of oil and/or gas from the well(s) drilled hereunder." ECF No. 71-2 at PageID #: 1805, ¶ 3 (emphasis added). According to Plaintiffs, Defendants have apparently allocated additional maintenance charges as demonstrated by the Operating Statement for all Properties, 12/01/2014 - 09/30/2017 (ECF No. 72-6).[5] While Defendants argue in a conclusory fashion that they have appropriately charged third-party maintenance fees, they do not identify these third-party expenses. *See* ECF No. 71-3 at PageID # 1860, ¶¶ 20 and 21. Moreover, the Operating Statements for each well apparently identify numerous third-party expenses for the DL-JV Wells that are listed separately from the well maintenance charges.

---

[5] Plaintiffs refer the Court to ECF No. 72-7 as being the Operating Statements for each Well. *See* ECF No. 72 at PageID #: 2096. ECF No. 72-7 are not the Operating Statements by Property, 12/01/2014 - 09/30/2017. Rather, it is a duplication of ECF No. 72-5, which is a copy of the July 12, 2016 Memorandum Opinion of the bankruptcy court.

### C. Breach of Fiduciary Duty (Count Two) and Negligence (Count Three)

Defendants argue the Court should grant summary judgment on Counts Two and Three in favor of Bobcat Energy Resources LLC and Bobcat Well & Pipeline, LLC ("BW&P") because the relationship between them and the Class Members arises solely from the contracts between D&L Energy and the Class Members and to which Bobcat Energy Resources LLC and BW&P became D&L Energy's successor. As a result, the Class Members' claims for breach of fiduciary duty and negligence, which seek only economic damages, fall squarely within the economic loss rule and are barred. "The economic loss doctrine prevents a party from recovering economic losses in tort that result from 'a breach of duties assumed only by agreement.'" *Onyx Envtl. Servs., LLC v. Maison*, 407 F. Supp.2d 874, 879 (N.D. Ohio 2005) (Carr, C.J.) (quoting *Corporex Dev. & Constr. Mgmt., Inc.*, 106 Ohio St.3d at 414).

The economic loss doctrine does not bar Plaintiffs' breach of fiduciary duty claim because Defendants' fiduciary duty owed to the Class Members exists for reasons other than the DL-JV Agreements, including a separate fiduciary duty as the Trustee of the Production Trust Account held for the benefit of the working interest owners. *See Ponder v. Bank of Am., N.A.*, 1:10-CV-00081, 2011 WL 8307207, at *5 (S.D. Ohio March 8, 2011) (declining to apply the economic-loss doctrine to bar plaintiffs' breach of fiduciary duty claim); *In re Nat'l Century Fin. Enterprises*, 504 F. Supp.2d 287, 325 (S.D. Ohio 2007) (declining to apply the economic-loss doctrine to bar a negligence claim when a fiduciary relationship exists). In addition, the Class Members are seeking punitive damages on their breach of fiduciary duty claim, so the economic loss doctrine does not apply. *See Combs v. Crown Life Ins.*, No. 1:07-CV-00151, 2008 WL

(4:15CV1993)

641557, at *7 (S.D. Ohio March 4, 2008) ("The fact that Plaintiff has pleaded punitive damages, in the Court's view, precludes Defendants' invocation of the economic loss doctrine.").

**D.  Request for an Accounting (Count Six) and Constructive Trust (Count Four)**

Citing *Complete Bldg. Show Co. v. Albertson*, 99 Ohio St. 11 (1918), Defendants argue that summary judgment should be granted on Plaintiffs' claims for an accounting and constructive trust because there is an adequate remedy at law.  In *Albertson*, the Supreme Court of Ohio held that "an action for the recovery of money as a debt or as damages is essentially an action at law, and, [where no fiduciary or trust relation exists between the parties,] cannot be converted into a suit in equity [for an accounting]. . . ." *Id.* at 15.  The Court concluded, "No facts are alleged which would entitle the plaintiff to the equitable action of accounting.  The parties did not sustain a fiduciary relation." *Id.* at 16.

Plaintiffs set forth four reasons why there is a fiduciary duty in the case at bar that allows for a request for an accounting.  First, Bobcat serves as the trustee of the Production Trust Account.  Mr. Rivkin testified:

> Q.    Do you know what was D&L's role, then, with regard to the production
>           trust account?
> A.    They were Trustee.
> Q.    And what became of that production trust account once Bobcat hired you?
>           Did you folks then take over the Trustee position?
> A.    Yes.

ECF No. 72-14 at PageID #: 2362.  The Class Members are the beneficiaries of the Production Trust Account involving revenues generated from the DL-JV Wells into which account the operator deposits revenues and from which the operator pays expenses.  ECF No. 69 at PageID #:

27

(4:15CV1993)

1626, ¶ 20.  It is Bobcat Well and Pipeline, LLC 's responsibility to maintain and operate the wells in an economically prudent manner.  ECF No. 69 at PageID #: 1626, ¶ 21.

Second, Count Six is particularly appropriate in the case at bar because Bobcat, as the Trustee and fiduciary, has not been able, despite the passage of almost 3 ½ years, to accurately account for the Class Members' funds held in the Production Trust Account.  *See Lebo v. Impac Funding Corp.*, No. 5:11CV1857, 2012 WL 630046, at *8 (N.D. Ohio Feb. 8, 2012) (Burke, M.J.) (an accounting claim arises from a fiduciary relationship or other trust relationship and is "predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another."), *report and recommendation adopted*, No. 5:11CV1857, 2012 WL 630049 (N.D. Ohio Feb. 27, 2012) (Dowd, J.)  While Bobcat has produced thousands of financial records during the discovery phase, Mr. Rivkin admitted these financial records may not provide an accurate accounting:

> Q.    The production trust account would be a vehicle that you would be able to show what the revenues were versus the expenses and whether a distribution was due?
>
> A.    It's *garbage in, garbage out*.  Whatever you enter into the system, that's what you get out.
>
> Q.    But it's the system that you have; correct?
>
> A.    It's the system that was there that we had to use, yes.
>
> \* \* \*
>
> Q.    Well, you folks have cranked out production trust account reports that go from 12-1-14 through 2017.
>
> A.    And that just *regurgitates whatever* is in Petroware over that period of

> time, whoever entered it.  So, the estate ran it for three or four
> months after closing for back periods of time.

ECF No. 72-14 at PageID #: 2363-64 (emphasis added).  In addition, Mr. Rivkin testified:

> Q.      How about under the current period 12-1 through 12-31, it says $4.5
>              million in revenues ?
> A.      From 2014 for three years?  That's possible.
> Q.      Do you know where this report comes from?
> A.      I think it's something you asked to be printed out of Petroware.
> Q.      And that's the software you folks use?
> A.      Like I told you; it's *garbage in, garbage out*.  So, all the historical stuff is
>              *worthless*.

ECF No. 72-14 at PageID #: 2365 (emphasis added).

Third, Plaintiffs argue that an accounting is necessary because Defendants have been manipulating the line item expenses in the Production Trust Account.  For example, an Operating Statement for the St. Paul #6 Well shows that Defendants incurred $21,840 in shut-in costs between December 1, 2014 and September 30, 2017, causing a significant financial loss to that particular Well.  Bobcat Operating Statement for St. Paul #6 (ECF No. 72-15).  When questioned about why Defendants would voluntarily cause a financial loss to a well, Bobcat's Director of Well Operations testified:

> Q.      In other words, the net is a negative number and the well lost money to the
>              tune of $21,860?
> A.      Right.
> Q.      What I want to ask you about is three-quarters of the way down under the
>              expenses it says "shut-in cost, $21,840."  Does that strike you as a
>              normal number, high number, or low number?
> A.      I don't know that.  Obviously, that's what made it to have the loss, but --
> Q.      The shut-in fee?

(4:15CV1993)

      A.     In this case, yes.

Deposition of David Rice (ECF No. 72-16) at PageID #: 2370-71.  After this issue was discussed

at the deposition, Defendants produced another Operating Statement for the St. Paul #6 Well.

This time, the reporting period was from December 1, 2014 to December 31, 2017.  Bobcat's

Second Operating Statement for St. Paul #6 (ECF No. 72-17).  The shut-in costs had decreased to

only $10,865.26.  It is impossible for the shut-in costs on a particular well to have decreased over

a longer period of time.  According to Plaintiffs, this lack of indicia of reliability is exactly the

reason that the Class Members should be provided with an accurate accounting.

      Finally, Bobcat Well and Pipeline, LLC is the operator of the DL-JV Wells, ECF No. 69

at PageID #: 1625, ¶ 16, and Bobcat Energy Resources, LLC is Trustee of the Production Trust

Account, ECF No. 72-14 at PageID #: 2362.  Plaintiffs argue it is Defendants' job and fiduciary

duty to provide an accurate accounting to the Class Members, since they have exclusive control

over the financial information for the Production Trust Account.

      **E.     Request for Declaratory Judgment (Count Five)**

      Defendants argue that Plaintiffs have incurred no damages because Bobcat backed out the

plugging expenses in an accounting entry.  ECF No. 71-14 at PageID #: 2060.  Plaintiffs contend

this argument is untenable considering that Bobcat has expressly stated that it will re-allocate

these expenses against the DL-JV Wells, warranting declaratory judgment on this issue.

Memorandum in Opposition (ECF No. 72) at PageID #: 2085.  Defendants acknowledge as much

in the memorandum in support when they state that "the issues about plugging expenses are now

(4:15CV1993)

reduced to declaratory relief with respect to Bobcat's future efforts to collect them." ECF No. 71-14 at PageID #: 2060.

## IV. Conclusion

Viewing Plaintiffs' probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiffs,

Defendants' Motion for Summary Judgment (ECF No. 71) is denied.

Counsel are reminded that this case is set for a jury trial on February 11, 2019 at 9:00 a.m. *See* Civil Trial Order (ECF No. 61).


IT IS SO ORDERED.


  January 22, 2019                        */s/ Benita Y. Pearson*
Date                                    Benita Y. Pearson
                                        United States District Judge